# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
#### 3:19-cv-00202-RJC-DSC

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **FRED D. GODLEY JR.;** | ) | |
| **F.D. GODLEY NUMBER THREE, LLC; and** | ) | |
| **436 CONE AVENUE, LLC,** | ) | |
| | ) | |
| **Defendants and Third-Party** | ) | **Order** |
| **Plaintiffs.** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **TOWN OF PINEVILLE; MITCHELL** | ) | |
| **COMMUNITY COLLEGE; MITCHELL** | ) | |
| **COMMUNITY COLLEGE FOUNDATION** | ) | |
| **AND ENDOWMENT FOR EXCELLENCE,** | ) | |
| **f/k/a MITCHELL COMMUNITY COLLEGE** | ) | |
| **ENDOWMENT FOR EXCELLENCE; and** | ) | |
| **IREDELL COUNTY,** | ) | |
| | ) | |
| **Third-Party Defendants.** | ) | |

**THIS MATTER** comes before the Court on Plaintiff United States' Motion for Summary Judgment, (DE 51); Defendants Fred. D. Godley's, F.D. Godley Number Three, LLC's, and 436 Cone Avenue, LLC's Motion for Summary Judgment, (DE 59); Third-Party Defendant Town of Pineville's Motion for Summary Judgment, (DE 56); and Third-Party Defendants Mitchell Community College's, Mitchell Community College Foundation and Endowment for Excellence's, and Iredell County's Motion for Summary Judgment, (DE 58).

These matters have been fully briefed, and on October 19, 2021, the Court heard oral argument. In addition, the Court has reviewed the pleadings, exhibits thereto, and applicable law.

The Court's decision is provided below.

## I.    BACKGROUND

### A.    Procedural Background

The United States ("Plaintiff" or "Government") filed this action pursuant to Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), to recover response costs it incurred in cleaning up hazardous substances at two sites in North Carolina—the Pineville Site and the Old Davis Site.  (DE 1). CERCLA entitles the Environmental Protection Agency ("EPA") to recover its response costs from responsible parties, including persons who owned and operated the facility where hazardous substances were released and disposed.  *See* 42 U.S.C. § 9607(a)(2).  Defendants Fred D. Godley, Jr. ("Godley"), 436 Cone Ave, LLC ("Cone Ave"), and F.D. Godley Number Three, LLC ("GNT") (collectively, "Defendants") are alleged to have owned and/or operated the sites, where hazardous polychlorinated biphenyls ("PCBs") and asbestos were released and disposed.  The Government is seeking summary judgment to hold each Defendant directly liable, joint and severally, for reimbursement of response and enforcement costs.[1]  Defendants do not dispute liability as it pertains to Cone Ave and GNT.  However, Godley disputes any direct liability he has as the managing member of Cone Ave and GNT.[2]

In response to the Government's CERCLA claims, Defendants filed third-party claims of contribution against the Town of Pineville ("Pineville") in relation to the Pineville Site and against Mitchell Community College ("MCC"), the Mitchell Community College Endowment for Excellence

---

[1] The Government seeks to hold Godley joint and severally liable for $2,515,195.36 for response costs incurred at both the Pineville Site and the Old Davis Site as well as the DOJ's enforcement costs in bringing this action.  The Government seeks to hold Cone Ave joint and severally liable for $304,060.60 for response costs incurred at the Pineville Site.  The Government seeks to hold GNT joint and severally liable for $1,619,056.43 for response costs incurred at the Old Davis Site.
[2] This Court's previous order, (DE 45), found that the issue of whether Mr. Godley was indirectly liable under a theory of veil piercing was a triable issue of fact.

("MCCEE"), and Iredell County ("Iredell") (collectively, the "MCC Parties") in relation to the Old Davis Site. Defendants also filed a claim for indemnification against Pineville regarding a land donation contract. CERCLA allows for any Defendant to seek contribution from any other covered party that would also be liable under the statute. Defendants seek summary judgment on these third-party claims.

Pineville and the MCC Parties deny any liability and filed cross motions for summary judgment. Pineville seeks dismissal of the contribution and indemnification claims and the MCC Parties seek dismissal of the contribution claim.

**B.** **Factual Background**

i. Pineville Site (Government, Cone Ave, Godley, and Pineville)

The Pineville Site is 28.3 acres and is located at 436 Cone Avenue, Pineville, Mecklenburg County, North Carolina. The property includes a dilapidated cotton mill built in 1894. All milling operations have been nonexistent since 1991. (DE 1 at ¶¶23–24).

On October 27, 1995, Godley purchased the Pineville Site for $1.2 million. *Id.* at ¶25. Fifteen years later, on April 1, 2010, Godley formed the LLC Cone Ave, a North Carolina limited liability corporation.[3] He then transferred ownership of the Pineville Site to Cone Ave on April 29, 2010. *Id.* at ¶¶6, 25–27. Godley and Godley Realty Company, Inc. ("Godley Realty") are the owners and members of Cone Ave. (DE 1, 18, 19 at ¶¶100(a)-(c)). Godley owns 99% of Cone Ave and Godley Realty owns the other 1%. Godley is the President and sole officer listed for Godley Realty. Godley is thus the sole person in charge of managing Cone Ave.

The original plan for the Pineville Site was to transform the property and old mill into a useful warehouse facility. But such a plan never came to fruition. Cone Ave's zoning applications

---

[3] Cone Ave was administratively dissolved on February 2, 2017. (DE 1 at 2).

3

were denied, which made the property more valuable with the old mill removed so that it could be developed. To perform the demolition, Cone Ave contracted with Steve Tarleton, a licensed general contractor. (DE 64 at 4). In return for performing demolition, Cone Ave allowed Tarleton to take valuable scrap materials. (DE 64 at 4). Defendants claim the contractor was in charge of day-to-day oversight and management of the demolition and bore responsibility for compliance with environmental regulations, (DE 60-49 at 88:1–4), and that Cone Ave exerted little control over the contractor, who was allowed to operate as he deemed appropriate. (DE 64 at 5).

Demolition activities began in 2013. (DE 19 at ¶30). As part of the demolition activities, the contractor drained transformer oil into drums and removed insulation. (DE 52-4 (Godley 9/10/20 Depo) at 242:6-243:12).

In the spring of 2014, the Town of Pineville issued notices of violation for windblown debris resulting from the demolition, including fiberglass insulation and metal. Around this same time, Mecklenburg County issued a Stop Work Order to halt demolition. Officials from the North Carolina Department of Environment and Natural Resources ("NCDENR") met with Godley, as manager of Cone Ave, and Tarleton, as contractor for the demolition activities. (DE 19 at ¶¶35–37). NCDENR then issued a letter to correct the violation of solid waste rules resulting from the demolition.

On August 28, 2014, NCDENR contacted the EPA and requested support responding to the Pineville Site. (DE 1 at ¶42). When EPA personnel were onsite, they observed 40 to 50 drums and containers around the property. The EPA also observed asbestos in demolition debris disposed in various locations on the property. (DE 53-1 (Action Memo) at PDF 1-4). The EPA confirmed through sampling that exposed pipe insulation on the floor of the old mill contained asbestos. (DE 53-3 (Removal Site Evaluation) at PDF 7, 48).

After the EPA became involved, Godley, as the manager of Cone Ave, provided oversight of the demolition, environmental concerns, and cleanup activities, and took actions to protect the interests of the LLC.  In that capacity, Godley worked with environmental contractors, like HAZ MAT, and EPA, Pineville, and NCDENR personnel.  Godley also responded to information requests from the EPA to avoid daily fines.  (DE 64 at 5).

After the property became mired in environmental violation notices from Pineville, the North Carolina Department of Environmental Quality ("NCDEQ"), and the EPA, and it became apparent the property faced expensive clean up and remediation costs, Cone Ave began looking for options to protect its interests by transferring the property.  (DE 64 at 5).   On December 21, 2015, Cone Ave transferred the Pineville Site to the Town of Pineville via a contractual arrangement (hereinafter referred to as the "Donor Agreement").   In exchange for the land, Pineville agreed to provide the following consideration:

> The Town agrees to pay the balance due on the deed of trust amount encumbering the Property in favor of the Carter Bank ($1,750,000), back taxes in the approximate amount of $89,582 (2012), $5,266.20 (2013), $57,396.64 (2014), $1,170.80 (2012), $1,109.83 (2013), and $1,024.17 (2014), including any taxes attributable to the tax year of closing. In addition the Town will assume the estimated cost and fees, and environmental cleanup costs in the approximate amount of $80,000 and any other action required by the federal EPA or the NC Department of Environmental Resources. Donor acknowledges that while the Town has agreed to assume the environmental cleanup costs and fees, Donor is not being released by the EPA or the NC Department of Environmental Resources for any such obligations.

(DE 60-19).

Drums containing PCBs and asbestos ladened debris were still visibly present on the property when Pineville took ownership.  To complete the cleanup, after Pineville took ownership, it paid a contractor $287,565.60 to bring the facility into compliance with all local, state, and federal laws.  (DE 57-1 at ¶14).  The EPA did not complete its onsite removal activities until May

1, 2016, five months after Pineville took ownership.  (DE 53-2 at PDF 7–8).

As of March 31, 2019, the EPA incurred at least $304,060.60 in removal costs for the Pineville Site.  (DE 51 at 21).

ii.    Old Davis Site (Government, GNT, Godley, and MCC Parties)

GNT is a North Carolina limited liability corporation that Godley formed on June 19, 1997. (DE 1 at ¶¶9, 57; DE 20 at ¶57).  Godley and Godley Realty are the owners and members of GNT. (DE 1, 18, 19 at ¶¶107(a)-(c)).  Godley owns 99% of GNT and Godley Realty owns the other 1%. Godley is the president and sole officer listed for Godley Realty.  Godley is thus the sole person in charge of managing GNT.

On July 1, 1997, GNT purchased an eight-acre parcel of property that included the five-acre Old Davis Site for $25,000.  (DEs 1, 19, 20 at ¶¶56, 58).  The Old Davis Site is located on West End Avenue, Statesville, Iredell County, North Carolina.  It included the former Statesville Hospital, which operated from 1920 until it was closed in the 1980s.  The hospital was in an advanced state of disrepair and showed signs of trespassing and vagrancy.  (DE 54-1 (POLREP #6) at PDF 2 and 4 (Site appears in YouTube videos and websites); DE 52-3 (Godley 9/9/20 Dep.) at 86:8–12).

In 2009, the City of Statesville had the Old Davis Site surveyed for asbestos removal and obtained an $800,000 estimate.  The city then notified GNT of the asbestos issue.  (DE 1 at ¶¶67–68; DE 20).

On March 24, 2015, GNT entered into a contract with MCC to sell the Old Davis Site, contingent on GNT's demolition and removal of all structures on the property by October 11, 2015. (DE 1 at ¶70; DE 20).  Demolition did begin in July 2015, but was not completed prior to the deadline, and the land transfer never occurred.

6

The general contractor selected for demolition by GNT was Steve Tarleton—the same general contractor used in the Pineville Site demolition. Like with the Pineville Site, Tarleton was allowed to take valuable scrap materials for completing demolition. GNT contends that Tarleton was responsible for complying with all laws and permitting requirements for the demolition and that GNT exerted little control over Tarleton who was allowed to operate as he deemed appropriate. GNT also contends it did not participate in day-to-day management of the demolition. (DE 64 at 7). However, after the EPA became involved, Godley, as the member-manager of GNT, became involved with demolition, environmental concerns, and cleanup activities, and took actions in the interest of GNT. In particular, Godley communicated with environmental contractors, EPA and NCDENR personnel, and responded to EPA information requests to avoid daily fines. (DE 64 at 7).

On September 22, 2015, the North Carolina Health Hazards Control Unit ("NCHHCU"), which implements asbestos abatement program, inspected the Old Davis Site in response to a complaint. (DE 1, 20 at ¶75).

In January 2016, GNT agreed to donate the Old Davis Site to MCC as soon as demolition was complete, and the property was environmentally clean. (DE 1 at ¶72; DE 20). Pursuant to this agreement, MCC agreed to reimburse GNT $404,000 for demolition and cleanup costs, minus $50,000 advanced by MCCEE under a separate loan agreement between MCC, MCCEE, and GNT. (DE 1 at ¶72; DE 20). The advance was provided so that GNT could afford hiring contractors to finish demolition and clean up. During execution of the agreement, Iredell County expressed that it would accept and waive dumping fees for the asbestos-containing debris. (DE 60 at 8–9). The transfer of the Old Davis Site under the donation agreement never occurred.

In June 2016, the NCHHCU requested assistance from the EPA to help mitigate potential

threats from asbestos-containing demolition debris on the property.  On a site visit, the EPA observed asbestos in two large demolition debris piles outside the old hospital building, each estimated to be 10 feet high by 100 feet long by 150 feet across.  (DE 54-2 (Action Memo) at PDF 2–4).  The EPA then conducted removal activities, including removing more than 3,900 tons of asbestos-containing debris.  The EPA finished onsite removal activities on September 1, 2016.  (DE 54-1 (POLREP #6) at PDF 2–4).

On September 26, 2016, the EPA filed a Notice of Federal Lien with the Iredell County Register of Deeds stating that the United States holds a lien on the Old Davis Site for its removal work in clearing the property.  At that time, GNT had failed to pay local property taxes for the previous five years, totaling $45,441.66.  This led Iredell County to commence a property tax foreclosure on November 4, 2016.  At the time of the foreclosure, the Old Davis Site was GNT's only real property asset. The Old Davis Site was sold at the tax foreclosure sale to Mitchell Community College Property Group ("MCCPG")[4] on May 30, 2017.  MCCPG transferred the Old Davis Site to MCC on May 5, 2018.  (DE 1, 20 at ¶¶91-94, 96, 98-99).

As of March 31, 2019, the EPA incurred at least $1,619,056.43 in removal costs for the Pineville Site.  (DE 51 at 21).[5]

## II.    LEGAL STANDARD

### A.    Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

---

[4] Defendants did not name MCCPG as a Third-Party Defendant.
[5] As of August 29, 2020, the U.S. Department of Justice ("DOJ") incurred at least $592,078.33 for both sites in prosecuting this action.  The Government has not delineated the portion of this cost attributable to each site, and the Government's summary judgment motion "does not seek summary judgment on the amount of Cone Ave and GNT's relative liability for DOJ's costs."  The motion only seeks to recover the full amount from Godley personally.  (DE 51 at 28).

8

56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. *Id.* The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citations omitted). "The burden on the moving party may be discharged by 'showing' . . . an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id.* at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted). The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id.* at 249–50.

## B.    CERCLA Liability

Congress enacted CERCLA in 1980 in response to the serious environmental and human health risks that industrial pollution poses. *United States v. Bestfoods*, 524 U.S. 51, 55 (1998); *see also United States v. Monsanto Co.*, 858 F.2d 160, 167 (4th Cir. 1988). To promote the timely cleanup of hazardous waste sites and ensure that responsible parties bear the costs of cleanup, CERCLA empowers the United States government to respond to hazardous waste sites and then seek recovery of its response costs from the responsible parties. *Burlington N. & Santa Fe Ry. v. United States*, 556 U.S. 599, 602 (2009); *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 120 (2d Cir. 2010). As a comprehensive remedial statutory scheme, CERCLA is construed liberally by courts to facilitate its goals. *Westfarm Assocs. Ltd. P'ship v. Wash. Suburban Sanitary Comm'n*, 66 F.3d 669, 677 (4th Cir. 1995).

In furtherance of CERCLA's goals, the United States is entitled to recover "all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan ["NCP"]." 42 U.S.C. § 9607(a)(4)(A). The NCP, codified at 40 C.F.R. Part 300, provides "the organizational structure and procedures for preparing for and responding to . . . releases of hazardous substances, pollutants, and contaminants." 40 C.F.R. § 300.1. Once the United States establishes a *prima facie* case of Defendants' liability, the United States' response actions are presumed consistent with the NCP. *United States v. NEPACCO*, 810 F.2d 726, 747 (8th Cir. 1986); *United States v. Hardage*, 982 F.2d 1436, 1443 (10th Cir. 1992); *see also United States v. R.W. Meyer*, 889 F.2d 1497, 1508 (10th Cir. 1989). Defendants may overcome this presumption only by showing that the EPA's choice of a particular response action was arbitrary and capricious based on the administrative record, and thus inconsistent with the NCP. *See* 42 U.S.C. § 9613(j); *see also NEPACCO*, 810 F.2d at 748; *Hardage*, 982 F.2d at 1443; *R.W. Meyer*, 889 F.2d at 1508.

Liability for response costs is, by default, joint and several among all the responsible

parties. *PCS Nitrogen Inc. v Ashley II of Charleston LLC*, 714 F.3d 161, 168 (4th Cir. 2013) (citing *Monsanto*, 858 F.2d at 171–72). Affirmative defenses to liability are set forth within CERCLA. *See, e.g.*, 42 U.S.C. § 9607(b). CERCLA Section 113(g)(2) requires that, once a party is found liable, the court "shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2).

## III. DISCUSSION

### A. Government's Motion for Summary Judgment Against Defendants

The Government's summary judgment motion seeks direct liability for each Defendant, including Godley, Cone Ave, and GNT. In particular, the Government argues (1) that Cone Ave and Godley are joint and severally liable for the EPA's response costs at the Pineville Site which totals at least $304,060.00 as of March 31, 2019; (2) that GNT and Godley are joint and severally liable for the EPA's response costs at the Old Davis Site which totals $1,619,056.43 as of March 26, 2019; and (3) that Godley is responsible for the DOJ's costs in prosecuting this case which totals $592,078.33 as of August 29, 2020. In response, Defendants Cone Ave and GNT, which are insolvent, do not contest liability. Mr. Godley, however, opposes a finding of direct personal liability for his role as the managing member of Cone Ave and GNT.

The Government is entitled to summary judgment on the issue of CERCLA liability if it proves the following: (1) the Pineville Site and the Old Davis Site are each a "facility" under Section 101(9); (2) a release or threatened release of hazardous substances occurred at the sites; (3) the release or threatened release caused the Government to incur response costs that are not inconsistent with the National Contingency Plan; and (4) the Defendant falls within one of the four classes of covered persons under Section 107(a). 42 U.S.C. § 9607(a); *PCS Nitrogen*, 714 F.3d at 168; *United States v. Sterling Centrecorp, Inc.*, 977 F.3d 750, 756 (9th Cir. 2020). Should the

11

Government succeed, strict liability attaches, and each Defendant is joint and severally liable for response costs, unless the Defendant shows a defense or exemption applies. *PCS Nitrogen*, 714 F.3d at 168.

As described below, the Government's summary judgment motion is **GRANTED in part** as to Cone Ave's liability for the Pineville Site and as to GNT's liability for the Old Davis Site, and **DENIED in part** as to Godley's direct personal liability for either site.

   i. <u>Cone Ave's Liability</u>

    a. *The Pineville Site is a "facility"*

A "facility" means "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9)(B). PCBs and asbestos are "hazardous substances" within the meaning of CERCLA. 42 U.S.C. § 9601(14); 40 C.F.R. § 302.4 App. A (listing asbestos and PCBs as hazardous substances).

It is undisputed that the Pineville Site was in disrepair; that there were 40 to 50 drums and containers on the site; that the EPA sampled the drum contents and PCBs were found; that the EPA observed friable asbestos in demolition debris such as pipe insulation disposed in various locations across the site; and that the EPA confirmed through sampling that exposed pipe insulation on the floor of the old mill contained asbestos. As the Pineville Site had hazardous PCBs and asbestos stored, disposed of, placed, or located on the site, it is a facility as defined by CERCLA.

    b. *There was a "release" or "threatened release" at the Pineville Site*

The introduction of any amount of a hazardous substance into the environment, including the land surface and ambient air, constitutes a release. *See* 42 U.S.C. § 9601(22) (defining "release"); 42 U.S.C. § 9601(8) (defining "environment"). Neither the quantity nor the concentration of the released hazardous substance is relevant to determining CERCLA liability. *See, e.g., Sherwin-Williams Co. v. ARTRA Group, Inc.*, 125 F. Supp. 2d 739, 749 (D. Md. 2001) (plaintiff need not prove quantities of

12

chemicals or frequency of releases).

Godley, on behalf of Cone Ave, admits that the EPA found PCBs in the soil at the Pineville Site and that he observed oil from the drums leaking into the ground. (DE 52-7 (Cone Ave 9/18/20 Dep.) at 101:2–102:17 (testifying that vandalism may have caused PCB oil to be on top of drums, which mixed with rainwater to spill onto ground)). This shows an actual release of PCBs to the land surface occurred. *See United States v. Lombardi Realty Inc.*, 204 F. Supp. 2d 318, 330 (D.R.I. 2002) (holding that "the presence of PCB-contaminated soil at the Site constitutes a 'release.'"). The PCB-containing drums also posed a threat of release because they were left outside, exposed to the elements and unsecured against vandalism. (DE 53-1 (Action Memorandum) at PDF 4–5; DE 53 (Englert Decl.) at ¶9 (Site had obvious signs of insufficient security and had graffiti on exterior and interior walls); 53-3 (Removal Site Evaluation) at 36 (photograph no. 32) and 48 (photograph no. 56)). There was also a threatened release of asbestos to ambient air from exposed pipe insulation, which contained friable asbestos, on the floor of the old mill. (DE 53-3 (Removal Site Evaluation) at 7 and 48; DE 53 (Englert Decl.) at ¶13 (similar crumbling and exposed pipe insulation observed at various places throughout building)). The exterior walls of the factory building contained holes and openings in them such that the interior was open to the outside at those points, without any barrier between the air inside and the air outside and without any protection from the elements. (DE 53 (Englert Decl.) at ¶¶10, 11 (wall holes and openings allowed water to enter); DE 53-3 (Removal Site Evaluation) at 44 (photograph nos. 47 and 48), 48 (photograph no. 56) and 51 (photograph no. 62)).

          c.     *The Government incurred response costs that are not inconsistent with the National Contingency Plan*

"Response" includes a removal action, 42 U.S.C. § 9601(25), meaning, *inter alia*, an action to monitor, assess, and evaluate the release or threat of release; and an action to prevent, minimize, or mitigate damage to the public health or welfare or to the environment. 42 U.S.C. § 9601(23). "Response" also includes all enforcement activities related to a removal action. 42 U.S.C. §

9601(25).

As of March 31, 2019, the EPA has incurred unreimbursed response costs of at least $304,060.60 at the Pineville Site. (DE 55 (Rodriguez Franco Decl.) at ¶42(a)). To address the release or threatened release of PCBs and asbestos, the EPA incurred costs to investigate and sample the drums on the site for PCBs, sample materials for asbestos, and oversee the Town's removal and disposal of drums and containers. (DE 53-3 (Removal Site Evaluation) at 2, 5; DE 53-2 at 7 (POLREP# 3). The EPA also incurred enforcement costs to obtain access to the site, obtain information from Cone Ave and Godley, and prepare an administrative enforcement order. (DE 53-2 at 5 (POLREP #2) and 7 (POLREP #3). Cone Ave does not dispute these facts, nor does Cone Ave argue that the response costs are inconsistent with the National Contingency Plan.

> ### d. *Cone Ave is a "covered person"*

Cove Ave is liable under CERCLA Section 107(a)(2) because they fall within the class of "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). The term "person" means an "individual, firm, corporation . . . [or] commercial entity." 42 U.S.C. § 9601(a)(21). CERCLA defines "disposal" to "have the meaning provided in Section 1004 of the Solid Waste Disposal Act," which defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 9601(29); 42 U.S.C. § 6903(3).

Here, Cone Ave is a commercial entity and, in particular, a limited liability corporation which meets the definition of a "person" under the statute. Cone Ave was also the "owner" of a facility—the Pineville Site—when disposal of hazardous substances occurred. As previously

described, PCBs were found in the soil and in drums that were left outside at the Pineville Site and asbestos was found around exposed piping. Placing exposed asbestos-containing insulation on land in a way that results in asbestos possibly dispersing into the outside air establishes the "disposal" element. *United States v. Fleet Factors Corp.*, 821 F. Supp. 707, 723 (S.D. Ga. 1993). So too does depositing PCB oil into drums and placing the drums outside to deteriorate and possibly leak into the soil. *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 846 (4th Cir. 1992) (holding that depositing hazardous waste into enclosed containers is a disposal); *State of N.Y. v. Almy Bros., Inc.*, 866 F. Supp. 668, 677 (N.D.N.Y. 1994) (whether defendants moved the drums themselves, knew of their movement, or simply stood by and allowed drums to deteriorate constituted disposal of hazardous substances).

Therefore, under CERCLA Section 107(a), Cove Ave is joint and severally liable for the $304,060.60 owed to the Government for the EPA's cleanup and enforcement costs associated with the Pineville Site. Cone Ave does not dispute this.

   ii.  <u>GNT's Liability</u>

    a.  *The Old Davis Site is a "facility"*

As described above, a site where asbestos is deposited, stored, or located is a facility under CERCLA. 42 U.S.C. § 9601(9), (14); 40 C.F.R. § 302.4 App. A. It is undisputed that the EPA observed friable asbestos in two large 10-feet-high demolition debris piles outside of the old hospital building and that the EPA conducted sampling that found asbestos in the debris piles, in soil, and in parts of the old hospital. As the Old Davis Site had hazardous asbestos stored, disposed of, placed, or located on the site, it is a facility as defined by CERCLA.

    b.  *There was a "release" or "threatened release" at the Old Davis Site*

As previously described, the introduction of any amount of a hazardous substance into the

environment, including the land surface and ambient air, constitutes a release. *See* 42 U.S.C. § 9601(8), (22); *Sherwin-Williams Co. v. ARTRA Group, Inc.*, 125 F. Supp. 2d 739, 749 (D. Md. 2001). Soil at the Old Davis Site contained asbestos, which shows that an actual release of asbestos from the demolition debris piles occurred. (DE 54-3 (Removal Action Report) at PDF 10–11; DE 54-1 (POLREP #6) at 4). The presence of uncontrolled piles of demolition debris containing friable asbestos further demonstrates a threatened release. (DE 54-1 (POLREP #6) at 2). Without anything to prevent the asbestos from migrating offsite, "[d]ry, windy conditions or precipitation runoff could cause asbestos fibers located at or near the surface to migrate offsite and pose a health hazard to nearby residential and student populations" at the immediately adjacent Mitchell Community College. (DE 54-2 (Action Memorandum) at 6; DE 54-3 (Removal Action Report) at 75 (photograph of uncovered demolition debris confirmed to contain asbestos)). The mere presence of asbestos in the soil and the presence of asbestos outside, exposed to the elements, and susceptible to release in the wind and rain, establishes the "release" or "threatened release" element. *See* 42 U.S.C. §§ 9601(8), (22); *see also United States v. Puerto Rico Indus. Dev. Co.*, 287 F. Supp. 3d 133, 144 (D.P.R. 2017) (presence of hazardous substance in groundwater constitutes a release or threatened release); *United States v. Domenic Lombardi Realty, Inc.*, 204 F. Supp. 2d 318, 329–30 (D.R.I. 2002) (contaminated soil constitutes a release); *Yellow Freight System, Inc. v. ACF Indus., Inc.*, 909 F. Supp. 1290, 1295, 1297 (E.D. Mo. 1995) (asbestos present outside building that was exposed to the elements and breaking away from piping constituted a release or threatened release); *United States v. Metate Asbestos Corp.*, 584 F. Supp. 1143, 1149 (D. Ariz. 1984) (asbestos fibers present on the surface of soil satisfies the release or threatened release element).

> c. *The Government incurred response costs that are not inconsistent with the National Contingency Plan*

As previously defined, "response" costs include those costs to cleanup and remediate a site and for all enforcement activities related thereto. 42 U.S.C. § 9601(23), (25). As of March 26,

2019, the EPA incurred unreimbursed response costs of at least $1,619,056.43 at the Old Davis Site. (DE 55 (Rodriguez Franco Decl.) at ¶42(b)). To address the release or threatened release of asbestos, the EPA incurred response costs to, *inter alia*, sample the demolition debris, soil, and air; secure the site against trespassers; and remove and dispose of more than 3,900 tons of asbestos-containing demolition debris offsite. (DE 54-1 (POLREP #6) at 2–3; DE 54-3 (Removal Action Report) at 11, 43–74 (photographs of removal operations and post-removal conditions)). The EPA also incurred enforcement costs to obtain access to the site and negotiate an enforcement agreement. (DE 54-2 (Action Memorandum) at 9; DE 54-4 (access authorization agreements)). GNT does not dispute these facts, nor does GNT argue that the response costs are inconsistent with the National Contingency Plan.

### d.    *GNT is a "covered person"*

GNT is liable under CERCLA Section 107(a)(2) because it falls within the class of "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2).

Here, GNT is a commercial entity and, in particular, a limited liability corporation which meets the definition of a "person" under the statute. 42 U.S.C. § 9601(a)(21). GNT was also the "owner" of a facility—the Old Davis Site—when disposal of hazardous substances occurred. 42 U.S.C. § 9601(29); 42 U.S.C. § 6903(3). As previously described, asbestos was found in multiple large debris piles as well as in soil samples taken from around and within the old hospital. Placing exposed asbestos-containing insulation on land in a way that results in asbestos possibly dispersing into the outside air establishes the "disposal" element. *United States v. Fleet Factors Corp.*, 821 F. Supp. 707, 723 (S.D. Ga. 1993).

Therefore, under CERCLA Section 107(a), GNT is joint and severally liable for the $1,619,056.43 owed to the Government for the EPA's cleanup and enforcement costs associated with

17

the Old Davis Site. GNT does not dispute this.

        iii.      <u>Godley's Liability</u>

In addition to holding Cone Ave and GNT liable as owners of the sites, the Government seeks to personally hold Godley directly liable as an operator of the sites for his actions as a member-manager of the LLCs. Section 9607(a)(2) attaches strict liability to "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). At issue is whether Godley's actions in managing the LLCs were eccentric under accepted norms such that limited liability protections do not shied him from personally liable. If direct liability attaches to Godley, he is personally liable, through joint and several liability, as an operator for the Government's response costs at both sites, which total $2,515,195.36—$1,923,117.03 for the EPA's cleanup and enforcement costs at both sites and $592,078.33 for the DOJ's costs in bringing this action.

The Government asserts the following facts which it alleges show that Godley acted outside the bounds of a normal member-manager such that he personally operated the sites:

- "Mr. Godley—as the only individual who had authority to undertake the above actions on behalf of Cone Ave—operated the Pineville Site to the same extent as Cone Ave. (DE 51 at 21).

- "Mr. Godley admits he was the sole manager of Cone Ave in charge of day-to-day operations and the sole person responsible for making environmental compliance decisions for the company." (*Id.*);

- "Mr. Godley serv[ed] as the individual contact for EPA employees." (DE 51 at 21–22).

- Cone Ave's environmental contractor, HAZ-MAT Services, emailed Mr. Godley about its assistance with answering EPA's 104(e) responses and noted that "It's up to you to finish

the questions." (DE 51 at 22).

- Mr. Godley testified that if hazardous substances were present at the Pineville Site, "I would be, as managing partner, responsible for the asbestos." (*Id.*).

- Mr. Godley "negotiated and entered into agreements to remove asbestos from and demolish structures at the Old Davis Site." (*Id.* at 26).

- Mr. Godley "managed and directed the demolition" at the Old Davis Site. (*Id.*).

- Mr. Godley paid for demolition permits and disposal, asked Iredell County to waive dumping fees, and obtained a proposal for an environmental survey. (*Id.*)

- Mr. Godley hired environmental consultants for the Old Davis Site. (*Id.*).

- Mr. Godley "respond[ed] to EPA's CERCLA information requests about and requests for access to the [Old Davis] Site." (*Id.*).

- "Mr. Godley was the only individual with authority to take [] actions on behalf of GNT." (*Id.*).

As support for its argument that Godley is directly liable, the Government cites to four main cases: *Bestfoods*, *Browing-Ferris I*, *Browning-Ferris II*, and *Tarrant*. In defense, Godley argues (1) that as the sole human manager he was the only person who could act on behalf of Cone Ave and GNT and this should not predispose him to personal liability; (2) that his actions as a member-manager of the LLCs do not open him up to personal liability in light of the strong limited liability protections afforded under North Carolina law; and (3) that the cited caselaw does not support the Government's position. Godley also states that the contractor was in charge of day-to-day oversight and management of the demolition and bore responsibility for compliance with environmental regulations for the demolition, and that Cone Ave and GNT exerted little control over the contractor, who was allowed to operate as he deemed appropriate. The Court addresses

19

the Parties arguments in turn below.

The Government cites to *Bestfoods* for the proposition that a person is directly liable as an operator under CERCLA when he or she participates in and controls the pollution-related activities of a facility. *United States v. Bestfoods*, 524 U.S. 51, 66-67 (1998); (DE 51 at 22). Such an assertion is an oversimplification. *Bestfoods* involved dual officers of both the parent corporation and its subsidiary, where the subsidiary corporation owned a polluting facility. The issue was "the extent to which parent corporations may be held liable under CERCLA for operating facilities ostensibly under the control of their subsidiaries." *Id.* at 60. For direct operator liability to attach to the parent corporation, the Court found that the parent corporation must "manage, direct, or conduct operations" of the facility, not the subsidiary corporation that owns the facility, and the operations must be "specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 55, 66–67. Even with this test in place, the Court noted the inherent difficulty "in defining actions sufficient to constitute direct parental 'operation,'" as CERCLA itself provides little guidance, but noted that the actions must be "eccentric under accepted norms." *Id.* at 66, 72. Nonetheless, the Court further noted that CERCLA does not replace "the entire corpus of state corporation law," of which limitation of liability is a fundamental principle. While *Bestfoods* does not give examples of the types of active control over polluting activities sufficient to trigger direct liability, other cases have endeavored to define the contours of operator liability.

In *Browning-Ferris I*, Maat was the president and principal shareholder of two corporations that owned a landfill where hazardous substances were dumped. *Browning-Ferris Indus. of Ill., Inc. v. Ter Maat*, 195 F.3d 953, 954–56 (7th Cir. 1999) ("*Browing-Ferris I*"). The two companies were found strictly liable, and the court had to determine whether Maat was also directly liable as

an operator. The court noted that limited liability protected Maat for his actions as president and shareholder, but this did not immunize him from actions that were distinct from the corporation's acts, for example, if "Maat operated the landfill personally, rather than just directing the business of the corporations . . . he is personally liable." *Id.* at 955–56. The court then provided an analogy on what constitutes active control of a facility such that liability attaches, stating that when a train negligently hits a driver, absent finding a personal action of the CEO like driving the train or sitting beside the driver and urging him to speed up, the CEO is not liable. *Id.* Of particular importance, the court noted that Maat would be liable for "negotiating waste-dumping contracts with the owners of the wastes or directing where the wastes were to be dumped or designing or directing measures for preventing toxic substances in the wastes from leeching into the ground and thence into the groundwater." *Id.*

On remand, the district court found Maat was directly liable as he negotiated contracts with waste haulers who brought in polluted materials, negotiated leases of the polluted site, constructed waste acceptance stations, personally accepted and rejected waste loads, inspected waste streams, and took and tested pollution samples. *Browning-Ferris Indus. of Illinois, Inc. v. Ter Maat*, No. 92-C-20259, 2000 WL 1716330, at *1-2 (N.D. Ill. Nov. 8, 2000), *aff'd*, 11 F. App'x 626 (7th Cir. 2001) ("*Browning-Ferris II*").

In *Tarrant*, MPF Plating and Finishing generated hazardous waste during manufacturing. *United States v. Tarrant*, No. CIV-A-03-3899 GEB, 2007 WL 1231788, at *1 (D.N.J. Apr. 25, 2007). MPF was founded by Tarrant, the sole shareholder and president. *Id.* Ms. Chatterton, who the court found directly liable as an operator, was an employee with no official managerial position in the company but functioned as a de facto CEO and was the "right arm" of Tarrant who was not involved in running the business. *Id.* at *1–4. After referencing *Bestfoods*, the court explained

21

that the "inquiry should not focus on whether the alleged operator had sufficient control to direct the hazardous substance disposal activities or prevent the damage caused, but should instead seek to determine whether that individual participated in the hazardous substance disposal activities." *Tarrant*, 2007 WL 1231788 at *2 (internal quotations omitted). The court found that Ms. Chatterton "participated in the hazardous substance disposal activities," in part, because she was in charge of shipping hazardous materials off site and decided whether to fund such shipments or to store the hazardous substances on site. *Id.* at *6.

This Court is unpersuaded that these cases, as well as the other cases cited in the Government's reply brief,[6] warrant a finding of direct liability for Godley based on the facts of this case. The Government cites to no binding precedent outside of the *Bestfoods* case, which lays out the general test for direct liability for a parent company with officers that also control a subsidiary company. Also, this court is not aware of, nor did the Government cite to, cases involving an LLC where the sole human member-manager was directly liable as an operator for his actions in managing the LLC. Moreover, the hazardous substances were released by the general contractor that Godley hired on behalf of Cone Ave and GNT, not by Godley. And, taking the facts and inferences in a light most favorable to Godley, the general contractor was responsible for day-to-day demolition activities and for following environmental regulations during

---

[6] *K.C.1986 Ltd. P'ship v. Reade Mfg.*, 472 F.3d 1009, 1013 (8th Cir. 2007) (Principal shareholder of company that polluted by blending herbicides together was liable as an operator when "he had approved procedures such as rinsing out truck tanks containing herbicides."); *City of Wichita, Kansas v. Trustees of APCO Oil Corp. Liquidating Tr.*, 306 F. Supp. 2d 1040, 1054–56 (D. Kan. 2003) (President of manufacturing company where hazardous substances leaked was liable as an operator when he was actively involved in addressing environmental compliance issues in weekly meetings that resulted from the spills.); *United States v. Lawrence Aviation Indus., Inc.*, No. 06-CV-4818-JMA-AYS, 2019 WL 1259791, at *14–15 (E.D.N.Y. Mar. 19, 2019) (President, CEO, and sole shareholder who directly managed the illegal storage and dumping of hazardous waste created from on-site titanium sheet metal manufacturing operations was liable as an operator.); *United States v. Meyer*, 120 F. Supp. 2d 635, 639–40 (W.D. Mich. 1999) (Owner and officer of a company that built a leaking sewer line was liable as an operator for directing the construction, alteration, and repair of the sewer line.); *United States v. Cap. Tax Corp.*, No. 04-cv-4138, 2007 WL 54039, at *11 (N.D. Ill. Jan. 4, 2007), *vacated on other grounds*, 545 F.3d 525 (7th Cir. 2008) (Manager of operations of a paint manufacturing company where hazardous substances were leaking out of hundreds of containers, were routinely spilled, and were dumped in a neighbor's garage was liable as an operator).

demolition. Unlike *Browning-Ferris II*—where the operator accepted and rejected waste loads, inspected waste streams, and took and tested pollution samples; *Tarrant*—where the operator was in charge of shipping hazardous materials off site; *K.C. 1986*—where the operator approved procedures for rinsing pesticides out of tanks; *City of Wichita*—where the operator decided environmental compliance actions for hazardous spills at a manufacturing company; *Lawrence Aviation*—where the operator directly managed illegal storage and dumping of hazardous chemicals; *Meyer*—where the operator helped build a leaking sewer; and *Capital Tax*—where the operator oversaw the dumping and spilling of hazardous chemicals during paint manufacturing; in the instant case, Godley had no direct participation or active control over polluting activities during demolition, as the contractor was responsible for demolition, and Godley's actions in controlling the LLCs, rather than the facility, were not "eccentric under accepted norms."

Put succinctly, taking the facts and inferences in a light most favorable to Godley, they show that he did not personally participate and was not directly involved in disposal activities outside of his role as manager. Here, Godley was actively involved in the operations of Cone Ave and GNT as he was the sole human manager who could make decisions for either entity. And, because both entities only had a single asset—the Pineville Site for Cone Ave and the Old Davis Site for GNT—every action that Godley undertook necessarily implicated these sites. While the undisputed facts show that Godley was involved and responsible for taking actions on behalf of these entities, they do not show that Godley took any direct actions involving pollution activities at the sites. He did not cause the hazardous substances to be placed on the sites as they were already present on the properties; he did not improperly collect the hazardous PCB chemicals in leaking drums or place piles of asbestos in the open; he did not personally cause hazardous substances to enter the sites, nor did he directly cause them to leak into the surrounding

23

environment. While he did select the contractor responsible for demolition and worked with the EPA after the contractor was relieved, these are all actions that any manager of an LLC would undertake. To hold such a manager directly liable for these actions would negate the strong limited liability protection afforded to managers of LLCs, an act that the Supreme Court recognized should not be easily done. *United States v. Bestfoods*, 524 U.S. 51, 72 (1998); N.C. Gen. Stat. § 57D-3-30; *Hamby v. Profile Prods., L.L.C.*, 361 N.C. 630, 638, 652 S.E.2d 231, 236 (2007) ("When a member-manager acts in its managerial capacity, it acts for the LLC, and obligations incurred while acting in that capacity are those of the LLC."). Additionally, to hold the sole human manager of an LLC that has one asset—a facility—personally liable as an operator for selecting a third-party contractor who improperly demolished buildings would put all single member LLC managers at risk of personal liability when he or she hires a contractor to perform demolition and remediation work. In situations like that presented in this case, veil piercing is the more appropriate vehicle to try and hold managers personally liable when they did not personally undertake direct actions themselves regarding the pollutants and instead operated the commercial entities that owned dilapidated facilities.[7]

### B. Defendants' Motion for Summary Judgment against Third-Party Defendants Pineville and the MCC Parties

Defendants Godley, Cone Ave, and GNT filed a summary judgment motion seeking a finding of liability as to Third-Party Defendants Pineville and the MCC Parties. In particular, Defendants seek claims of contribution and indemnification from Pineville and a claim of contribution from the MCC Parties. Pineville and the MCC Parties argue against a finding of liability and have each filed cross motions for summary judgment seeking dismissal of Defendants'

---

[7] As Godley did not file a cross motion for summary judgment seeking a finding of no direct liability, this Court's denial of the Government's summary judgment motion on this issue does not preclude the Government from bringing a direct liability claim at trial.

claims.

i.     <u>Liability of Third-Party Defendant Pineville</u>

a.     *Indemnity Provision in Donation Agreement*

Cone Ave and Godley assert that Pineville indemnified them concerning all environmental clean-up costs incurred at the Pineville Site, including for actions that occurred before Pineville took ownership of the site. (DE 60 at 11; DE 66 at 6). Pineville disagrees. (DE 57 at 14). Both parties claim the plain language of the donation agreement, whereby Cone Ave transferred the site to Pineville, is clear and unambiguous.

CERCLA does not preclude private parties from allocating risks amongst themselves for environmental liability. *See Dixon Lumber Co. v. Austinville Limestone Co.*, 386 F. Supp. 3d 688, 712–13 (W.D. Va. 2019). In fact, CERCLA specifically permits it: "Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section." 42 U.S.C. § 9607(e)(1). The only caveat is that while private parties may allocate the costs and liability amongst themselves, they cannot absolve themselves of liability to the EPA through such a contract. *Dixon Lumber Co.*, 386 F. Supp. 3d at 712–13. Rather, any party who may be liable under CERCLA remains liable, with the indemnitor then becoming ultimately responsible for the costs. *Id.* Courts will "enforce a contract that allocates loss suffered by imposition of CERCLA liability 'where the provisions evince a clear and unmistakable intent of the parties to do so.'" *Dixon Lumber Co.*, 386 F. Supp. 3d at 713 (quoting *Keywell Corp. v. Weinstein*, 33 F.3d 159, 165 (2d Cir. 1994)). To answer whether the provisions "evince a clear and unmistakable intent," federal courts look to state law for contract interpretation principles. *Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 306 (4th Cir. 2020); *see also PCS Nitrogen, Inc. v. Ashley II of Charleston*, LLC, 714 F.3d 161, 173 (4th Cir. 2013).

In North Carolina, when a court interprets a contract, the court's primary function is to

25

ascertain the parties' intention as expressed in their written instrument. *See Lane v. Scarborough*, 284 N.C. 407, 409 (1973). If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract considered as a whole. *See State v. Philip Morris USA Inc.*, 363 N.C. 623, 631 (2009). Only when terms of a contract are ambiguous are courts authorized to apply rules of construction. *See Jones v. Casstevens*, 222 N.C. 411, 413–414 (1942). Here, the pertinent portion of the donation agreement provides:

> 4.  Escrow; Closing. The Town agrees to pay the balance due on the deed of trust amount encumbering the Property in favor of the Carter Bank ($1,750,000), back taxes in the approximate amount of $89,582 (2012), $5,266.20 (2013), $57,396.64 (2014), $1,170.80 (2012), $1,109.83 (2013), and $1,024.17 (2014), including any taxes attributable to the tax year of closing. In addition the Town will assume the estimated cost and fees, and environmental cleanup costs in the approximate amount of $80,000 and any other action required by the federal EPA or the NC Department of Environmental Resources. Donor acknowledges that while the Town has agreed to assume the environmental cleanup costs and fees, Donor is not being released by the EPA or the NC Department of Environmental Resources for any such obligations.

(DE 60-19).

Cone Ave and Godley argue that the plain language of the contract makes it clear that "Pineville agreed to accept, assume, and pay all costs charged to Cone Ave or Godley by the EPA related to the Pineville Site." (DE 60 at 13). Third-Party Defendant Pineville did not file a response in opposition to Defendants' summary judgment but did file a cross motion for summary judgment specifically addressing this issue. (DE 57 at 14). In the cross motion for summary judgment, Pineville argues that it only assumed environmental cleanup costs and fees to complete remediation after it acquired the Pineville Site (for which it paid for), not for actions Cone Ave and Godley took before the land transfer. (DE 57-1 at ¶ 13). After Pineville took ownership of the site, "Pineville completed voluntary clean up measures . . . including the removal and disposal of the containers and drums offsite with oversight from EPA, which totaled $287,565.60." (DE

57 at 15).

Here, the alleged indemnification provision is located in section four, which is titled "Escrow; Closing." (DE 60-19 at 3). Of note, there is no miscellaneous contract provision to ignore the headings in the contract, so the heading "escrow" instead of "indemnification" or "assumption of liabilities" holds some weight.

Substantively speaking, section four has three sentences. The first sentence states that Pineville, in exchange for the property, will pay off Defendants' loan amount and pay back taxes. The second sentence, which will be discussed more fully below, lists three actions that Pineville agreed to take and assume liability for. The third sentence states that while the Town "has agreed to assume the environmental cleanup costs and fees," Cone Ave is not relieved of liability under CERCLA.

The three things listed in sentence two, which Pineville agreed to assume liability for are (1) "estimated cost and fees," (2) "environmental cleanup costs in the approximate amount of $80,000," and (3) "any other action required by the federal EPA or the NC Department of Environmental Resources." The costs and fees in the first subgroup and cleanup costs in the second subgroup do not include a definite time interval. Nor does the "any other action" requirement in subgroup three. And because "any other action" is listed after "costs and fees" it tends to show that "any other actions" includes non-monetary acts, such as communicating with the EPA. This means that "any" in this context, does not mean at any point in time. In sum, the plain language of the contract does not "evince a clear and unmistakable intent" to indemnify Defendants for all CERCLA liability. Instead, it shows that Pineville, once it assumed ownership, agreed to pay for the cleanup costs and to work with the EPA to complete remediation as the site was left with hazardous substances present.

Nonetheless, even if the plain language was ambiguous regarding whether Pineville indemnified Defendants for all liability, the extrinsic evidence shows that Pineville did not.

Pineville submitted the declaration of Haynes Brigman. (DE 57-1 at ¶12). Mr. Brigman was the Town manager for Pineville at all relevant times for this case. In his declaration, he stated that, via the contract, "Pineville assumed the estimated costs and fees to remedy the condition in which the Property was left by [Defendants] at the time of the property's acquisition by Pineville" and "to bring the property into compliance with the EPA."

Defendants disagree, submitting emails between counsel for Cone Ave and Pineville during negotiation of the agreement as extrinsic evidence of the parties' intent. In one email, Godley responds to his attorney that he negotiated an agreement with Pineville where "[Pineville] has also accepted cost, fees, and environmental clean up" and "assum[es] the EPA and DENHR obligations." (DE 60-3 at 2). In another email, counsel for Pineville tells counsel for Cone Ave to include additional language in the agreement that Defendants acknowledge they may be responsible under CERCLA because the "current language reads as if the Town is agreeing to accept all responsibility that Mr. Godley may have under CERCLA." (DE 60-9 at 2). This email, along with the additional language requested by Pineville which became sentence three of section four, shows that the parties understood that Pineville did not agree to accept all CERCLA liability. This mirrors what actually occurred after Pineville took ownership. As Pineville agreed in sentence two of section four, it paid for the environmental cleanup costs to remove the remaining hazardous substances left on the site when it took ownership. In particular, Pineville paid contractors $287,565.60 to cleanup the site and bring the property into compliance with EPA and North Carolina laws. (DE 57-1 at ¶14). It also interacted with the EPA, who provided oversight

28

during remediation efforts by Pineville until the site was brought into compliance.  Thus, the plain language and extrinsic evidence do not "evince a clear and unmistakable intent" of Pineville to assume all CERCLA liability from Defendants.  Instead, the only clear and unmistakable intent is that Pineville agreed to pay for remediation costs once it took ownership of the property, which it did.  *Smithkline Beecham Corp. v. Rohm & Haas Co.*, 854 F. Supp. 1201, 1210 (noting that parties can indemnify one another for portions of CERCLA liability and are not required to indemnify for the entire CERCLA liability).  Accordingly, Defendants' motion for summary judgment regarding the indemnification claim fails.

b.      *CERCLA Strict Liability*

Defendants allege that Pineville is strictly liable under CERCLA as an owner of a facility at the time hazardous substances were disposed and, as such, seek contribution for response costs owed to the Government in relation to the Pineville Site.  Pineville failed to respond to Defendants' summary judgment motion but did file its own summary judgment asserting a statute of limitations and innocent landowner defense to any CERCLA liability.  CERCLA strict liability applies to "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of."  42 U.S.C. § 9607(a)(2).  Regardless of whether an entity is a named defendant, any defendant in a CERCLA case can seek contribution from other unnamed parties who are also liable under CERCLA's broad reach.  42 U.S.C. § 9613(f)(1); *see also* U*.S. v. Atl. Research Corp.*, 551 U.S. 128, 138–39 (2007).

Here, Pineville is the record owner of the Pineville "facility" at the time hazardous substances were disposed of and are thus strictly liable under CERCLA.  Pineville admits, and the undisputed facts show, that at the time of transfer Cone Ave and Godley had neither successfully abated the asbestos-containing materials nor properly disposed of the leaking drums containing PCBs.  After receiving the Pineville Site, Pineville completed the remediation with oversight from

29

the EPA. Thus, for the same reason Cone Ave is strictly liable as the owner of the Pineville Site at the time of disposal, so too is Pineville. Pineville is thus joint and severally liable and subject to a contribution claim should it fail to succeed on an affirmative defense.

ii.    Liability of Third-Party Defendants MCC Parties

Defendants GNT and Godley assert that the MCC Parties are joint and severally liable as "arrangers" under Section 9607(a)(3) and, as such, are subject to a contribution claim. The pertinent language of Section 9607(a)(3) states:

> [A]ny person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances. . . .

Responsible parties who fall under the umbrella of Section 9607(a)(3) but who are not named as defendants by the EPA in a cost recovery action may nonetheless be liable to a named defendant for contribution under Section 9613(f). *See U.S. v. Atl. Research Corp.*, 551 U.S. 128, 139–40 (2007). The critical issue here is whether each of the MCC Parties is an arranger under the statute.

While CERCLA does not define the term "arrangers," the Supreme Court has found that "under the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." *Burlington Northern & Santa Fe Ry. v. United States*, 556 U.S. 599, 611 (2009). GNT and Godley assert that the MCC Parties were arrangers because they "entered into a multitude of contracts, transactions, and arrangements to realize that objective." (DE 60 at 18). In essence, Defendants assert that the MCC Parties were arrangers because they induced GNT via contract to clean up the hazardous substances at the Old Davis Site.

30

The undisputed facts are as follows:

- On March 24, 2015, GNT entered into a contract with MCC to sell the Old Davis Site, contingent on GNT's demolition and removal of all structures on the property by October 11, 2015. (DE 1 at ¶70; DE 20). Demolition did begin in July 2015, but was not completed prior to the deadline, and the land transfer never occurred.

- In January 2016, GNT agreed to donate the Old Davis Site to MCC as soon as demolition was complete, and the property was environmentally clean. (DE 1 at ¶72; DE 20). Pursuant to this agreement, MCC agreed to reimburse GNT $404,000 for demolition and cleanup costs, minus a $50,000 advancement by MCCEE under a separate loan agreement between MCC, MCCEE, and GNT. (DE 1 at ¶72; DE 20). The advance was provided so that GNT could afford hiring contractors to finish demolition and clean up. During execution of the agreement, Iredell County expressed that it would accept and waive dumping fees for the asbestos-containing debris. (DE 60 at 8–9). The transfer of the Old Davis Site under the donation agreement never occurred.

- The Old Davis Site was sold at a tax foreclosure sale to MCCPG on May 30, 2017. MCCPG transferred the Old Davis Site to MCC on May 5, 2018. (DE 1, 20 at ¶91–94, 96, 98–99).

Thus, Defendants here allege that the MCC Parties are liable as "arrangers" because they entered into contracts with Defendants to assist with the removal of the hazardous substances from the Old Davis Site. Such a result is counterintuitive to the goal of CERCLA—to promote the timely cleanup of hazardous waste sites and ensure that responsible parties bear the costs of cleanup. *Burlington N. & Santa Fe Ry. v. United States*, 556 U.S. 599, 602 (2009). In almost all the case law cited by Defendants, arrangers or alleged arrangers are directly involved in the sale

and/or transport of hazardous substances from location A to location B, where location B is the

facility where the hazardous substances are ultimately disposed that later requires remediation.[8]

This is not analogous to the present case as the MCC Parties did not broker, sell, or transport

hazardous substances from one location that were then disposed at the Old Davis Site. Instead,

the opposite is true. The MCC Parties assisted and encouraged Defendants, via agreements, to

remove the hazardous substances that had already been spilled at the Old Davis Site to a proper

waste facility, which was ultimately accomplished.

Moreover, the MCC Parties did not arrange "for disposal or treatment" at the Old Davis

Site. Here, the actions of the MCC Parties did not result in environmental damages through

leakage of hazardous substances at the Old Davis Site, nor did the Defendants allege any facts that

---

[8] *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 607–08 (2009) (Court denied EPA's arranger liability claim against Shell for selling and delivering chemicals to a pesticide company that regularly spilled the chemicals during the delivery exchange because Shell did not enter "into the sale . . . with the intention that at least a portion of the product be disposed of during the transfer process"); *S. Fla. Water Mgmt. Dist. v. Montalvo*, 84 F.3d 402, 405–08 (11th Cir. 1996) (court denied an aerial pesticide company's arranger liability contribution claims against farmers who contracted with the company to have their fields sprayed because the farmers took no "affirmative act to dispose of the wastes" when the company spilled chemicals onsite during mixing and rinsing out of the containers); *Consolidation Coal Co. v. Georgia Power Co.*, 781 F.3d 129, 144–46, 155 (4th Cir. 2015) (court denied arranger liability for Georgia Power who sold used transformers with PCB-laden oil inside to a party who later spilled the oil and contaminated a site because the sales did "not indicate the intent to dispose of PCBs"); *MEMC Pasadena, Inc. v. Goodgames Indus. Sols., LLC*, 143 F. Supp. 3d 570, 576, 581 (S.D. Tex. 2015) (finding an entity that coordinated the transport of hazardous substances from a manufacturing facility, MEMC, to a polluted waste facility that required remediation, U.S. Oil, liable as an arranger where the entity "suggested the U.S. Oil Site, organized MEMC's site visit, coordinated the exchange of paperwork between MEMC and U.S. Oil for the Site to be added to MEMC's approved contractor list, advised MEMC about the number of loads U.S. Oil could handle, delivered samples of MEMC's waste to U.S. Oil, contacted transporters to pick up MEMC's waste, received invoices directly from U.S. Oil, and sent invoices to MEMC with a 10–26% markup for GIS's services"); *Am. Cyanamid Co. v. Capuano*, 381 F.3d 6, 24–25 (1st Cir. 2004) (finding a broker who coordinates disposal of hazardous substances liable as an arranger when the broker "selected, secured, and directed the waste" to be dumped at an illegal cite); *Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066, 1069–70, 1080–82 (9th Cir. 2006) (zinc smelting company located in British Columbia liable as an arranger for dumping slag into the Columbia river which polluted an Indian reservation in Washington state); *Cadillac Fairview/California, Inc. v. United States*, 41 F.3d 562, 563–66 (9th Cir. 1994) (Dow potentially liable as an arranger when it treated contaminated styrene to make synthetic rubber when hazardous byproducts were created during treatment and deposited on site); *Agere Sys. v. Advanced Envtl. Tech. Corp.*, 2006 U.S. Dist. LEXIS 84114, *4–6, 26 (court found AETC, a business involved in the transportation and disposal of hazardous substances, liable as an arranger when it contracted with parties to remove hazardous waste from facilities that was later dumped at a superfund site); *United States v. Ne. Pharm. & Chem. Co.*, 810 F.2d 726, 729–31, 733–34 (8th Cir. 1986) (vice president and supervisor of manufacturing plant who approved of disposing of hazardous chemicals at a local farm that was not a proper waste facility was liable as an arranger); *Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 673, 677–78, 685 (3d Cir. 2003) (parties who transacted to have "dirty" mercury cleaned at a mercury processing plant could be liable as arrangers when the processing plant that cleaned the mercury polluted nearby lands).

32

the MCC Parties treated the hazardous substances at the Old Davis Site. The undisputed facts show that, at most, the MCC parties assisted and encouraged Defendants to remove the hazardous substances that were previously disposed at the Old Davis Site and transfer them to a proper waste facility, and played no part in the disposal or leakage that occurred during the original demolition at the Old Davis Site.

Thus, Defendants' allegation that "the MCC Parties intended to dispose of asbestos at the Old Davis Site and entered into a multitude of contracts, transactions, and arrangements to realize that objective" is unsupported by the facts. It is also contradicted by the very next sentence in Defendants' motion, which states that "MCC arranged to have Iredell County accept the friable and non-friable asbestos from the Old Davis Site demolition . . . thereby selecting the actual disposal facility where the hazardous substances would be disposed of." (DE 60 at 18). It is the Iredell County Landfill that is the only facility where any MCC party could potentially be construed as arranger. Notably, there is no allegation of, nor is this lawsuit about, any release of hazardous substances and ensuing cleanup costs at the Iredell County Landfill. And tellingly, there is no case law holding a party liable as an arranger for assisting in remediation efforts to remove hazardous substances from a polluted site to a proper waste facility.

To make such a holding would lead to illogical results that run counter to CERCLA's purpose. For example, a finding of arranger liability for the MCC Parties could result in future liability for any entity which assists in the cleanup or remediation of any hazardous substance and make them automatically liable for the costs to clean up the entirety of the hazardous substance, simply because during remediation efforts, the hazardous substances were taken and disposed at a proper waste facility—an act that occurs during every remediation. To attach liability to proper disposal of hazardous substances would give every defendant in a CERCLA case the right to file

a lawsuit against any local, state, or federal agency who assisted in a remediation effort, along with every private entity that assisted in the remediation, and make each joint and severally liable for the costs of the entire cleanup. This would inevitably chill government agencies and private companies and citizens from assisting with remediation, which contravenes the purpose of CERCLA. Accordingly, Defendants' summary judgment on arranger liability for the MCC Parties fails.

### C. Third-Party Defendant Pineville's Motion for Summary Judgment

Cone Ave and Godley assert that Pineville is liable under CERCLA as an owner of the Pineville Site and seeks contribution and indemnification from Pineville. For the reasons previously stated, this Courts agrees that Pineville is strictly liable absent proving an affirmative defense applies. In Pineville's motion for summary judgment, Pineville denies that it is a responsible party subject to liability and asserts that, regardless of whether it is a responsible party, it should be absolved of liability because the statute of limitations has tolled, and it is an innocent landowner. Pineville also denies that it indemnified Cone Ave under the donation agreement.

#### i. Statute of Limitations Defense

Pineville asserts that it should be considered an improper party to the lawsuit because the statute of limitations for costs recovery is three years, and the United States failed to bring any claim against Pineville within this timeframe. Under 42 U.S.C. § 9613(g)(3), contribution claims under CERCLA are tolled three years after the date of a judgment or settlement. Here, the EPA's claims against the Defendants are still pending and have not resulted in a judgment or settlement, so the applicable statute of limitations for a contribution claim has not yet begun to accrue. Accordingly, Pineville's statute of limitation defense as to the contribution claim against it fails as the contribution claim is not time barred.

#### ii. Innocent Landowners Defense

While Pineville denies that it is a responsible party that is subject to liability, it argues that even if it was a responsible party, the innocent landowner defense in Section 9607(b)(3) absolves it of liability. The innocent landowner defense is codified in 42 U.S.C. § 9607(b)(3) and states:

> There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by . . . an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant, . . . if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions.

The Fourth Circuit has found that, as the name implies, the innocent landowner defense[9] under Section 9607(b)(3) only applies to those landowners who "did not know and had no reason to know of the presence of hazardous substances when it acquired a facility." *PCS Nitrogen Inc. v. Ashely II of Charleston LLC*, 714 F.3d 161, 180 (4th Cir. 2013) (internal quotations removed). Here, Pineville admits that it knew of the hazardous substances present on the Pineville Site when it acquired the property from Cone Ave and Godley. As such, the innocent landowner defense fails.

### iii.     Indemnification under the Donation Agreement

Defendants assert that Pineville indemnified them concerning all environmental clean-up costs incurred at the Pineville Site, and assumed all responsibility for future environmental clean-up costs for any actions that Defendants undertook before Pineville took ownership. Pineville

---

[9] Unlike the innocent landowner defense under Section 9607(b)(3), the bona fide prospective purchaser defense under Section 9601(35) is not precluded because the acquiring party knew of the hazardous substance. *PCS Nitrogen Inc. v. Ashely II of Charleston LLC*, 714 F.3d 161, 180 (4th Cir. 2013). However, the Court does not address the BFPP defense as Pineville did not raise it in its summary judgment motion, as the first time Pineville discussed this defense was in its reply brief. (DE 87 at 2).

disagrees, asserting that it only assumed liability for the removal actions once it took ownership, and moves for summary judgment on this issue. Both parties claim the plain language of the contract is determinative.

For the reasons previously stated regarding Defendants' summary judgment motion on this issue, there is no clear and unmistakable intent of Pineville to indemnify Cone Ave and Godley for all CERCLA liability. Instead, the only clear and unmistakable intent is that Pineville agreed to pay for remediation costs once it took ownership of the property, which it did. *Smithkline Beecham Corp. v. Rohm & Haas Co.*, 854 F. Supp. 1201, 1210 (noting that parties can indemnify one another for portions of CERCLA liability and are not required to indemnify for the entire CERCLA liability). Accordingly, Pineville's motion for summary judgment to dismiss Defendants' indemnification claim is granted.

### D. Third-Party Defendants MCC Parties' Motion for Summary Judgment against Defendants

MCC Parties move for summary judgment, arguing that they are not liable under 42 U.S.C. § 9607(a)(1)-(4) and, even if they were liable under Section 9607(a)(1), the bona fide prospective purchaser ("BFPP") defense precludes liability.

### i. CERCLA Liability

In response to the summary judgment motion, Defendants admit the only theory of liability they asserted against the MCC Parties is upon the basis of "arranger" liability under Section 9607(a)(3) and disclaim any other liability theories. As previously discussed when analyzing Defendants' motion for summary judgment, the MCC Parties are not "arrangers" under Section 9607(a)(3) and are not liable. Defendants' contribution claim against the MCC Parties thus fails as a matter of law and is dismissed.

### ii. Bona Fide Prospective Purchaser ("BFPP") Defense

36

The BFPP defense is codified at Section 9607(r)(1) and states that "notwithstanding subsection [9607](a)(1), a bona fide prospective purchaser whose potential liability for a release or threatened release is based solely on the bona fide prospective purchaser being considered to be an owner or operator of a facility shall not be liable as long as the bona fide prospective purchaser does not impede the performance of a response action or natural resource restoration." Defendants admit they are not pursuing an action for liability and contribution against the MCC Parties under Section 9607(a)(1)-(2) for the MCC parties' status as "an owner or operator of a facility." Accordingly, the BFPP defense is inapplicable here.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1.      The Government's Motion for Summary Judgment, (DE 51), is **GRANTED in part** and **DENIED in part**. Specifically:

      a.      The motion is **GRANTED** as to Cone Ave's liability for response costs at the Pineville Site.

      b.      The motion is **GRANTED** as to GNT's liability for response costs at the Old Davis Site.

      c.      The motion is **DENIED** as to Godley's direct liability for response costs at the Pineville Site and the Old Davis Site.

2.      Defendants' Motion for Summary Judgment, (DE 59), is **GRANTED in part** and **DENIED in part**. Specifically:

      a.      The motion is **GRANTED** as to Pineville's liability for response costs at the Pineville Site.

      b.      The motion is **DENIED** as to the indemnification claim against Pineville.

37

        c.      The motion is **DENIED** as to the MCC Parties' liability as arrangers for response costs at the Old Davis Site.

3.      Pineville's Motion for Summary Judgment, (DE 56), is **GRANTED in part** and **DENIED in part**.  Specifically:

        a.      The motion is **GRANTED** as to the indemnification claim.

        b.      The motion is **DENIED** as to the statute of limitations and innocent landowner defenses.

        c.      Defendants' indemnification claim against Pineville is **DISMISSED**.

4.      MCC Parties' Motion for Summary Judgment, (DE 58), is **GRANTED in part** and **DENIED in part**.  Specifically:

        a.      The motion is **GRANTED** as to the MCC Parties' lack of liability for response costs at the Old Davis Site.

        b.      The motion is **DENIED** as to the BFPP defense.

        c.      Defendants' contribution claim against the MCC Parties is **DISMISSED**.

Signed: November 10, 2021

Robert J. Conrad, Jr.
United States District Judge